IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK Division
IN ADMIRALTY

| | |
|---|---|
| Seaward Marine Corporation<br><br>        Plaintiff,<br><br> v.<br><br>M/V CMA-CGM DON PASCUALE, (IMO NO. 9318101)<br><br>and its engines, tackle, furniture, apparel, freights, and appurtenances, *in rem,*<br><br>        Defendant. | Case No: |

**VERIFIED COMPLAINT *IN REM* WITH REQUEST TO ACCEPT LETTER OF UNDERTAKING IN LIEU OF ARRESTING VESSEL**

NOW COMES Plaintiff, Seaward Marine Corporation (hereinafter, "Seaward Marine"), by counsel, and as and for its Verified Complaint against the Defendant M/V CMA-CGM DON PASCUALE (IMO NO. 9318101), her engines, tackle, furniture, apparel, freights, appurtenances, etc., *in rem*, (hereinafter and collectively, "the Vessel") states as follows:

**JURISDICTION, AND VENUE**

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and within this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333, the Admiralty Extension Act, 46 U.S.C. § 3010, *et seq* and Supplemental Rule C for Certain Admiralty and Maritime Claims, because this dispute involves a Vessel allision on the navigable waters of the Chesapeake Bay.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred within this judicial district. In the alternative, venue is proper

in this Court because The Vessel regularly has been within this district and may again be found within the jurisdiction of this Honorable Court at some point during the pendency of this action.

## THE PARTIES

3. At all times material to this action, Seaward Marine was and is a Virginia corporation with its headquarters and principal place of business located in Norfolk, Virginia.

4. The Vessel, M/V CMA-CGM DON PASCUALE (IMO NO. 9318101), which on information and belief is entered into the vessel registry and flying the flag of Malta, is and was owned and operated by CMA-CGM S.A. at all times relevant to this action. The Vessel is not currently believed to be in this district, but it has previously been in this district on a regular basis and may again be within this district and within the jurisdiction of this Honorable Court at some point during the pendency of this action.

5. NorthStandard EU DAC, as protection and indemnity insurers for the Vessel, has executed in favor of Seaward Marine a Letter of Undertaking dated June 2, 2025 agreeing, *inter alia*, to file or cause to be filed an *in rem* appearance on behalf of the Vessel in this action in lieu of arrest or any other surety, a true and accurate copy of which is attached hereto as **Exhibit 1** to this pleading. Coincident with the filing of this Verified Complaint, Seaward Marine is filing with this Court a Motion to Approve and Accept a Letter of Undertaking in Lieu of Arrest, thereby establishing the jurisdiction of this Honorable Court over the Vessel for the purposes of this action.

## FACTUAL BACKGROUND

6. At all times relevant to this action, Seaward Marine was under contract to support work being done by the Chesapeake Bay Bridge Tunnel Joint Venture (hereinafter, the "CTJV") to expand the Chesapeake Bay Bridge Tunnel (hereinafter, the "CBBT").

7. At all times relevant to this action, Seaward Marine had vessels working in support of the CTJV's ongoing marine construction operations at the CBBT.

8. Among Seaward Marine's vessels working in support of the CBBT construction project were Seaward Marine's tug GERI T and its barge U-804.

9. On December 10, 2024, as part of the work being done for the CTJV by Seaward Marine, the GERI T was made fast to the loaded U-804, and that tug-and-barge combination ("TBC") was secured to mooring dolphins on the western side of the rip rap that surrounds the First Island of the CBBT.

10. Ahead of where the GERI T/U-804 TBC was moored was the CBBT's Fishing Pier that extends westward from the First Island.

11. Because of the bottom topography around the First Island, the wakes of large vessels passing between the First Island and the Second Island of the CBBT can become amplified as those wakes reach the area of the rip rap that surrounds each of the islands.

12. The Vessel is a large ship, 1,096 feet in length, with a beam of 140 feet, a draft of 48 feet, and displacing over 100,000 tons.

13. Mariners transiting the waters of Hampton Roads, Virginia have been on notice for several years that major construction activity is and has been ongoing at and around the First Island and the Second Island of the CBBT, that moored and underway vessels routinely are involved in supporting that construction effort there, and that vessels transiting the area need to be mindful of their wakes and the potential damage they can cause to that construction effort and the vessels associated with it.

I-2916996.2

14. The Vessel routinely calls in Hampton Roads, making port calls in the area several times each year, passing by the CBBT and the construction site there both inbound and outbound on each of those occasions.

15. On the morning of December 10, 2024, the Vessel was headed to sea, approaching the First Island of the CBBT from the west, proceeding at approximately eighteen knots, with a Virginia Pilot aboard.

16. As she was headed to sea and approaching the CBBT on December 10, 2024, the Vessel was throwing a dangerously large and excessive wake behind it.

17. At the time the Vessel was approaching the First Island of the CBBT on December 10, 2024, it was broad daylight, the weather was calm, the atmosphere was clear, and visibility was unlimited.

18. For a distance of several miles, the GERI T/U-804 TBC could be seen moored to pilings on the western side of the First Island at the CBBT construction site near the Fishing Pier, from the bridge of the Vessel as it approached the First Island from the west.

19. Despite having an unobstructed view of the moored GERI T/U-804 TBC on the western side of the First Island for several miles, the Vessel did not slacken its speed as it approached the First Island nor did it take any other action to reduce or minimize its dangerous wake or the effects of its suction as it approached and eventually passed close aboard the First Island and the moored GERI T/U-804 TBC there.

20. The very strong suction and dangerously large and excessive wake thrown by the Vessel caused all of the mooring lines holding the GERI T/U-804 TBC fast to the mooring pilings at the First Island to part, the GERI T/U-804 to be torn from its mooring, and to be flung violently

into the nearby pilings of the Fishing Pier, causing significant structural damage to the Fishing Pier and slight damage to the rake of the U-804.

21. The Allision occurred without any fault or negligence on the part of Seaward Marine, the GERI T, or the U-804.

22. The Allision occurred without any fault or negligence on the part of the Chesapeake Bay Bridge and Tunnel District, as owner of the Fishing Pier, or the CTJV.

23. The Allision resulted from the negligence of the Vessel.

24. As a direct result of the Allision tortiously caused by the Vessel and the harm Seaward Marine suffered as a result, Seaward Marine has a maritime lien in the Vessel for amount of Seaward Marine's damages caused by and arising from the Allision.

25. As a direct result of the Allision and because of the danger of the weakened Fishing Pier's collapse, the CTJV directed Seaward Marine to post a security guard near the damaged Fishing Pier, around the clock for a period of many weeks, to warn boaters to stay away from the Fishing Pier. The expense of providing these security guards was made necessary by, and due to the negligence of the Vessel.

26. As a direct result of the Allision and because of the danger of the weakened Fishing Pier's collapse, the CTJV directed Seaward Marine to provide a barge-mounted crane to facilitate the emergency evacuation of a number of CTJV work trailers that had been located on the Fishing Pier at the time of the Allision. The expense of conducting this emergency evacuation of the work trailers was made necessary by, and due to, the negligence of the Vessel.

27. As a direct result of the Allision and because of the danger of the weakened Fishing Pier's collapse, the CTJV directed Seaward Marine to remove and temporarily store the two concrete spans of the Fishing Pier that were in danger of falling into the Chesapeake Bay and that

had to be removed to facilitate the underwater inspection of the Fishing Pier's pilings damaged by the Allision. The expense of removing and storing those two concrete spans of the Fishing Pier was made necessary by, and due to, the negligence of the Vessel.

28. To date, the aggregate cost of providing security guards, the emergency evacuation of the work trailers, and the removal and storage of the two spans of the Fishing Pier borne by Seaward Marine is in excess of one million forty-eight thousand six hundred sixty-four dollars ($1,048,664.00 U.S.) and increasing at a rate of one thousand one hundred dollars ($1,100.00 U.S.) per day.

29. Seaward Marine has demanded reimbursement from CMA-CGM, S.A. through its subsidiary, CMA-CGM (America), LLC, for the foregoing costs Seaward Marine has incurred to remedy and mitigate the damage cause by the negligence of the Vessel in causing the Allision. CMA-CGM S.A. has denied Seaward Marine's demand.

30. Seaward Marine now seeks indemnification from the Vessel for the foregoing costs Seaward Marine has incurred to remedy and mitigate the damage cause by the negligence of the Vessel in causing the Allision.

## COUNT I - MARITIME NEGLIGENCE

31. Seaward Marine incorporates by reference, the allegations contained in Paragraphs 1 through 30 of this Complaint as if set out in full herein.

32. The general maritime law imposes liability against the Vessel, *in rem* at the time of the Allision and at the time of the events leading up to the Allision.

33. The Vessel had a duty to comply with the Inland Navigation Rules, 33 C.F.R. 83.05 and 83.06, which require vessels to operate at safe speeds, to always maintain a proper look-out, and to navigate prudently and in keeping with the ordinary practice of seamen or by the special circumstances a vessel may encounter.

34. The Vessel failed to comply with the Inland Navigation Rules at or about the time of the Allision because it was operating at an unsafe speed, failed to maintain a proper lookout, and failed to navigate prudently and in keeping with the ordinary practice of seamen or by the special circumstances it encountered approaching the First Island of the CBBT.

35. Under the general maritime law, the Vessel had a duty to ensure that it avoided unnecessarily creating a damaging suction and wake when in the vicinity of other vessels or property that could be damaged by such a suction or wake.

36. The Vessel unnecessarily created a damaging suction and wake when in the vicinity of other vessels or property that could be damaged by such a suction and wake at or about the time of the Allision.

37. Additionally, under General Maritime Law the Vessel had a duty of care to others to act prudently and avoid creating unusual suctions, swells, or wakes.

38. The foregoing duties owed by the Vessel were owed to, *inter alia*, the Chesapeake Bay Bridge and Tunnel District, the CTJV, and Seaward Marine.

39. The Vessel breached the foregoing duties when it proceeded at an unsafe speed, failed to maintain a proper lookout, failed to navigate prudently and in keeping with the ordinary practice of seamen or by the special circumstances it encountered, and unnecessarily created a damaging suction and wake when transiting past the First Island of the CBBT on the morning of December 10, 2024.

40. As a direct result of the breach of the foregoing duties by the Vessel, the GERI T/U-804 TBC was torn from its mooring and flung into the pilings of the Fishing Pier, severely damaging that structure and causing some damage to the rake of the U-804.

I-2916996.2

41. To date, Seaward Marine has expended more than one million forty-eight thousand six hundred sixty-four dollars ($1,048,664.00 U.S.) as a result of the negligence of the Vessel, and that cost to Seaward Marine continues to increase at a rate of one thousand one hundred dollars ($1,100.00 U.S.) per day.

42. As a result of the foregoing tortious actions of the Vessel, causing harm to Seaward Marine, Seaward Marine has a maritime lien in the Vessel for the full amount of the damages it has suffered as a result of the Allision.

## COUNT II- EQUITABLE SUBROGATION

43. Seaward Marine incorporates by reference, the allegations contained in Paragraphs 1 through 42 of this Complaint as if set out in full herein.

44. Seaward Marine is in no way liable or legally responsible for the losses incurred by the Chesapeake Bay Bridge and Tunnel District and/or the CTJV as a result of the Allision.

45. The Vessel's negligence was the cause of the damage sustained by and losses incurred by the Chesapeake Bay Bridge and Tunnel District and/or the CTJV as a result of the Allision.

46. The CTJV required Seaward Marine to take remedial action (to include posting guards, the emergency evacuation of the work trailers, and the removal and storage of two spans of the Fishing Pier) in response to the damage done by, and to mitigate the danger of future harm resulting from, the negligent actions of the Vessel

47. The sums expended by Seaward Marine to remediate the damage done by, and to mitigate the danger of future harm resulting from, the Allision were to pay a debt owed the Chesapeake Bay Bridge and Tunnel District and/or the CTJV by the Vessel, a debt for which Seaward Marine was not and is not primarily liable.

48. Seaward Marine should be reimbursed by the Vessel for the sums it expended to remediate the damage done by, and to mitigate the danger of future harm resulting from, the Allision in order to support the notions of justice.

49. By expending more than one million forty eight thousand six hundred sixty-four dollars ($1,048,664.00 U.S.) to remediate the damage done by, and to mitigate the danger of future harm resulting from, the negligent actions of the Vessel as a result of the Allision, Seaward Marine is equitably subrogated to the claim(s) of the Chesapeake Bay Bridge and Tunnel District and/or the CTJV against the Vessel, up to the amount paid by Seaward Marine for that purpose, for the damage done by, the losses incurred, and to mitigate the danger of future harm resulting from, the Allision.

50. As a result of the foregoing, the Vessel is liable to Seaward Marine in an amount to be proved at trial, but which currently is more than one million forty-eight thousand six hundred sixty-four dollars ($1,048,664.00 U.S.), for which Seaward Marine has not been paid despite a demand to the Vessel's owner and operator, and for which Seaward Marine is in possession of a maritime lien against the Vessel.

## **PRAYER FOR RELIEF**

51. Seaward Marine repeats and re-alleges Paragraphs 1-50 of this Complaint as if set forth in full herein.

52. Given the foregoing, Plaintiff Seaward Marine is entitled to the judgement of this Court against the Vessel *in rem*, in an amount to be proved at trial, but which currently is more than one million forty-eight thousand six hundred sixty-four dollars ($1,048,664.00 U.S.), plus such pre- and post-judgment interest as is available under the general maritime law.

I-2916996.2

**WHEREFORE**, Plaintiff Seaward Marine Corporation prays:

1. That this Honorable Court enter judgment in favor of Seaward Marine Corporation and against Defendant CMA-CGM DON PASCUALE, *in rem*, in the amount to be proved at trial but no less than one million forty-eight thousand six hundred sixty-four dollars ($1,048,664.00 U.S.), together with such pre- and post-judgment interest as is available under the general maritime law; and

2. That Seaward Marine Corporation be granted such other and further relief as this Court may deem just and proper.

Dated:  June 3, 2025

SEAWARD MARINE CORPORATION

By:    */s/ Christopher A. Abel*
Christopher A. Abel
VSB No. 31821
Hannah R. Spring
VSB No. 100463
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
Phone:  757. 628.5547
Fax:  757.333.3547
cabel@wilsav.com
hspring@wilsav.com

*Counsel for Plaintiff Seaward Marine Corporation*

I-2916996.2

## VERIFICATION

I am the Vice-President of Marine Construction of Seaward Marine Corporation, the Plaintiff in this action. On behalf of the Plaintiff, I verify under solemn affirmation that the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge and information.

Pursuant to 28 U.S.C.§ 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 3, 2025.

By: _____
Nathan Sebura
Vice-President of Marine Construction
Seaward Marine Corporation
602 Ford Drive
Norfolk, VA 23523

COMMONWEALTH OF VIRGINIA,
CITY OF NORFOLK, TO-WIT:

The foregoing instrument was acknowledged, sworn, and signed before me, a notary in and for the Commonwealth and City aforesaid, this 3rd day of June, 2025 by Nathan Sebura, who is personally known to me or who has produced ____Known_____ as satisfactory proof of his identity.

_____
Notary

My Commission Expires: 5/31/2028

Pamela J Brown
Commonwealth of Virginia
Notary Public
Commission No. 230143
My Commission Expires 5/31/2028

11

I-2916996.2